# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| ELVIS MATSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-18-2369 |
| | § | |
| SANDERSON FARMS, INC. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Elvis Matson sued his former employer, Sanderson Farms, Inc., asserting violations of the Family and Medical Leave Act, the Americans with Disabilities Act, Title VII, and 42 U.S.C. § 1981. Matson alleges that Sanderson Farms discouraged him from taking medical leave; interfered with his leave; and then fired him because he is African-American, had "mental issues," took FMLA leave, complained about discrimination, and filed a charge with the Equal Employment Opportunity Commission. Sanderson Farms moved for summary judgment, arguing that it granted Matson's medical leave and that it had a legitimate and nondiscriminatory reason for firing Matson. Matson responded that Sanderson Farms's reason was a pretext for discrimination and for retaliation for taking medical leave and for filing an EEOC charge. Sanderson Farms replied, and Matson surreplied. (Docket Entry Nos. 1, 18, 22, 26, 31).

After a careful review of the complaint; the record evidence; the motion, response, reply, and surreply; and the applicable law, the court finds that Matson has not identified or submitted evidence supporting a reasonable inference that Sanderson Farms either interfered with his FMLA leave, or discriminated or retaliated against him for taking the leave and filing an EEOC charge. Because there are no factual disputes material to deciding these issues, summary judgment is

granted for Sanderson Farms, and final judgment is separately entered. The reasons are explained in detail below.

## I.    Background

This would have been an easy case but for some complicating facts. Sanderson Farms granted FMLA leave to Matson for residential mental-health treatment. Unbeknownst to Matson, Sanderson Farms, or the treatment facility, the treating "doctor" was no doctor at all. He was, instead, a nurse practitioner. The nurse practitioner wrote Matson a return-to-work letter with facially apparent authenticity problems and sent the letter to Matson through his personal email. Matson forwarded the email and letter to Sanderson Farms. Sanderson Farms contacted the treatment center to authenticate the letter, and the treatment center assured Sanderson Farms that the letter had not been written by one of its physicians. This assurance led Sanderson Farms to fire Matson for falsifying a physician's statement, as its work rules require. But Sanderson Farms was ready, and tried, to reinstate Matson promptly after learning that the "psychiatrist"—the nurse practitioner posing as a doctor—had, in fact, written the return-to-work letter.

Matson, however, did not return to work when offered reinstatement, choosing instead to continue to work at his brother's trucking company and search for positions at other companies. There are no allegations that any medical condition prevented Matson from returning to Sanderson Farms on the dates it specified, to complete the reinstatement process. Because Sanderson Farms had a legitimate and nondiscriminatory reason to fire Matson when he declined to return to work for reasons unrelated to health, summary judgment is granted to Sanderson Farms.

At bottom, the case involves an employer that met its statutory obligations and an employee who did not meet his employment obligations. The employer is entitled to summary judgment.

## A.    The Summary Judgment Record

The facts are shown by the parties' summary judgment evidence.  The summary judgment evidence includes the following:

- transcripts from the depositions of Matson, Amberly Sherwood, Brenda Gatlin, and Casey Laub;

- declarations from Matson, Judy Matson, Amberly Sherwood, Casey Laub, and Jennifer Buster;

- Sanderson Farms's job description for the master skilled mechanic position; and its substance abuse policy, work rules, and other employment documents;

- commercial driver licenses held by Sanderson Farms employees besides Matson;

- Matson's psychiatric evaluation from a behavioral-health center;

- the certification forms for Matson's FMLA leave;

- documents showing that Sanderson Farms granted Matson's FMLA leave;

- return-to-work letters sent to Sanderson Farms from Matson's treatment center;

- email correspondence between Sanderson Farms, Matson's treatment center, and Matson;

- a transcript from a recording of the meeting in which Matson was fired;

- the Sanderson Farms termination and reinstatement paperwork for Matson;

- the findings and conclusion from the Arizona State Board of Nursing's investigation into the nurse practitioner who held himself out as a doctor; and

- Matson's EEOC discrimination charge and related documents.

(*See generally* Docket Entry Nos. 18-1, 23, 26-1).

**B. What the Record Evidence Shows**

Sanderson Farms is a Mississippi company that processes chicken products in facilities across the country, including in Bryan, Texas. (Docket Entry No. 1 at 1–2). In September 2009, Sanderson Farms hired Matson as a master mechanic. (Docket Entry No. 18-1 at 5–7, 54–55). His job was to maintain and repair the commercial trucks and trailers, perform road tests, train other mechanics, and keep inventory at the Bryan Facility. (*Id.*). The master-mechanic position required the "[a]bility to obtain a class A [commercial driver's license] within [a] specific time limit." (*Id.* at 56). Matson drove commercial trucks "every day" and maintained his commercial driver's license. (*Id.* at 8).

When Matson was hired, Sanderson Farms gave him the "Work Rules for Hourly Employees." (*Id.* at 62, 76). Under these Rules, falsifying a "doctor's statement" was "cause for discharge without warning." (*Id.* at 66). The Sanderson Farms Department of Transportation Drug and Alcohol Policy permitted an employee to return to work after self-identifying a drug or alcohol problem, but the employee had to meet with a mental-health professional and pass an unannounced drug and alcohol test before returning to work. (*See id.* at 170–200; Docket Entry No. 23 at 111–12). An employee's "failure to appear for any test within a reasonable time" counted as a refusal to take the test, and the employee would be fired. (Docket Entry No. 18-1 at 172–78).

Matson has a history of psychiatric problems, including hallucinations and thoughts of self-harm. (Docket Entry No. 23 at 7–8). Early in January 2016, Matson was diagnosed with Hepatitis C and gout and prescribed Interferon for 12 weeks. (*Id.* at 8–9, 81). The gout caused inflammation in his foot, and the Interferon made Matson's psychiatric problems worse. He had "meltdowns"

at Sanderson Farms.[1]  (*Id.* at 9, 81).  Matson asked Sanderson Farms if he could "work [his] 40 [hours] in four days" instead of five, explaining his "medical condition" and "what was going on in [his] mind."  (*Id.* at 20).  Sanderson Farms approved Matson to work 4-day weeks, which Matson described as a "special accommodation[]" allowing him to "stay on the job."  (*Id.* at 20).

On May 25, 2016, Matson was admitted to the Rock Prairie Behavioral Health Center for residential treatment for "depression, anxiety, and agitation."  (*Id.* at 97).  His initial psychiatric evaluation described "an obese male, in severe distress," with bipolar disorder, alcohol dependence, and nicotine dependence.  (*Id.* at 97–98).  Matson told Rock Prairie that he had been "drinking about a half a pint or a fifth [of liquor] on a daily basis now," and had smoked "four packs [of cigarettes] in the last 24 hours."  (*Id.* at 97).  The evaluation, signed by Dr. Fernando G. Torres, stated:

> The patient will stabilize with the care plan involv[ing] medication management, group, individual therapy, family therapy.  Estimated length of stay will be a week. Initially, the patient is going to be prescribed medications [that have] some sedative properties, but as he recovers then [Dr. Torres] will lessen the medications so they will not adversely affect his commercial driver's license operations.

(*Id.* at 98).  Matson testified that he submitted a FMLA request for his stay at Rock Prairie in early June 2016, but the record does not contain that request or its result, and it is unclear when Matson left Rock Prairie.  (Docket Entry No. 18-1 at 10–11).

In July 2016, Judy Matson, Matson's wife, became convinced that he needed "professional psychiatric treatment" because his "depression, mood swings[,] and insomnia continued" after the Interferon treatment ended.  (Docket Entry No. 23 at 100).  Judy Matson arranged in-patient

---

[1]  Matson reported that during one "meltdown" he became "real agitated," "started kind of seeing black spots into [his] head," began "kicking stuff," and "talking sideways."  (Docket Entry No. 23 at 22). His supervisor, Randy Flores, "got [Matson] out of the shop" to calm him down, asking Matson if he was "going to be all right" and "if he needed to home."  (*Id.*).  Matson "hold him no, just let me finish out the day."  (*Id.*).

treatment for Matson from "Doctor" Rodney Dy Wolpert at the Red Rock Addiction and Treatment Company outside Phoenix, Arizona. (*Id.*).

On July 20, the Matsons both went to Sanderson Farms to meet with Amberly Sherwood, the Field Employee Relations Manager at the Bryan Facility, about Matson's "health and his need to take time off to get treatment." (*Id.*). According to Matson, he told Sherwood that he needed "FMLA [leave] for a mental issue." (*Id.* at 9). He got the FMLA leave

Matson arrived in Arizona on July 23, 2016. (*Id.* at 10–11, 13–15, 23). He went to a hospital for two weeks for examinations and "psychiatric interviews" to determine which in-patient residential treatment center best suited his medical needs. (*Id.* at 10–11, 13–15). After his hospital stay, Matson was admitted to Red Rock Addiction and Treatment Company for treatment. He saw Dy Wolpert, the faux doctor, each day for an hour of therapy. (Docket Entry No. 18-1 at 14–16; Docket Entry No. 23 at 12). Dy Wolpert told Matson that he was "schizophrenic" and that his condition was "life threatening." (Docket Entry No. 18-1 at 19). Matson left Red Rock on August 26, 2016, after about 30 days. (Docket Entry No. 23 at 13).

Unknown to the Matsons and to Red Rock, Dy Wolpert was neither a psychologist nor any kind of medical doctor. (Docket Entry No. 26-1 at 4–5). He was a licensed nurse practitioner who worked at Red Rock from June to September 2016 and held himself out as a psychiatrist. (*Id.* at 4–6, 11). Red Rock fired Dy Wolpert on September 28, 2016, after "numerous issues with his employment." (*Id.* at 17). The Arizona State Board of Nursing later investigated Dy Wolpert, finding a long and deeply troubling history of serious misconduct and misrepresentations to patients. (*See generally id.*). Dy Wolpert voluntarily surrendered his Arizona nursing license in September 2017, after the investigation concluded that he had violated many Arizona laws. (*Id.* at 20–24).

Shortly after arriving at Red Rock, Matson asked Sanderson Farms for FMLA leave. On July 28, 2016, Red Rock sent Sanderson Farms a completed "Certification of Health Care Provider for Hourly Employee's Serious Health Condition." (Docket Entry No. 18-1 at 127–30). This initial certification form listed Matson's job title as "MAINT. 1" and his medical provider as "Dr. Dy Wolpert," described as a "psychiatrist." (*Id.*). The contact number for Dy Wolpert was, confusingly, Sanderson Farms's number. (*Id.*). The initial certification form stated that Matson was "hospitalized due to life threatening conditions" and could not work. (*Id.*). According to the initial certification form, Dy Wolpert treated Matson between July 20 and 25, 2016. (*Id.*).

On the morning of August 4, 2016, Jeffrey Baker, a Red Rock case manager, sent Sanderson Farms another certification form, this time using the Sanderson Farms preprinted FMLA form. (Docket Entry No. 18-1 at 78, 84–85, 121). The second certification form had Sanderson Farm's name and contact preprinted and listed Matson's title as "Master Skill M1," describing his job functions. (*Id.* at 78). But like the initial certification form, this second certification form stated that: "Dr. Dy Wolpert" was Matson's medical provider; Sanderson Farms's phone number was the contact number for Dy Wolpert; Matson was "hospitalized due to life threatening conditions" that would last about "3 months"; Matson could not work during those 3 months; and Dy Wolpert treated Matson between July 20 and 25, 2016. (*Id.* at 13, 78–80).

After Sanderson Farms received the second certification form, Amberly Sherwood asked Brenda Gatlin, the Sanderson Farms Senior Employee Relations Manager, if she could have Casey Laub, the Bryan Facility's Occupational Health Nurse, seek clarification from Red Rock on the form, including on the "life threatening conditions" that the form referred to. (Docket Entry No. 23 at 51). Gatlin replied, "Yes[,] we need to clarify what exactly is his condition[, h]ave the nurse call." (*Id.* at 115).

Amberly Sherwood told Laub "to obtain additional information so that [Sanderson Farms] could certify . . . Matson's request." (Docket Entry No. 18-1 at 140). Laub did not contact Dy Wolpert because the number for him on the second certification form was Sanderson Farms's number. (*Id.* at 140–41). In an email to Sherwood and Gatlin, Laub voiced her concerns:

> Something is not right with this situation. The physician's name listed on these FMLA papers is a psychiatrist who lists an office in Florida on the internet. The phone number on the FMLA papers is the phone and fax for our hatchery. When I call the phone number listed for that name on the physician's self-help web page, I get a cell phone that the person who answered stated [he] was a government IT help cell phone. Per the website, [Red Rock] is an alcohol and substance abuse treatment center in Arizona.

(Docket Entry No. 23 at 169).

Laub, the Occupational Health Nurse, called and emailed Red Rock, asking to speak with Dy Wolpert to clarify why Matson "needs to be off of work" and to obtain Wolpert's "contact information." (Docket Entry No. 18-1 at 83). Baker, the Red Rock case manager, responded that he understood why Laub "might be confused." (*Id.*). Baker provided the following information:

> [Matson] is currently in a[n] inpatient program for substance abuse treatment. His listed diagnosis on his EMR is F19.2 Substance Use Disorder, moderate[,] and F10.2 Alcohol Use Disorder, severe. His first interaction was at our detox center and is now at the above listed treatment center. He is currently scheduled to be with us for 30 treatment days.

(*Id.*). On August 5, 2016, based on the information Baker sent, Sanderson Farms approved Matson's FMLA leave from July 20, 2016 to October 20, 2016, as the second certification form requested. (*Id.* at 137–38).

On August 30, 2016, Sanderson Farms received two return-to-work letters for Matson. (*Id.* at 87–89). The first letter was on Red Rock letterhead and signed by Jeffrey Baker and Erika Heckman, the Red Rock Program Director. (*Id.* at 89). It stated that "Elvis Matson successfully completed our Residential Substance Abuse Treatment program and Partial Hospitalization

Program with Sober Living Housing on August 26th, 2016." (*Id.*). According to the letter, "[t]he doctor, Dr. Dy Wolpert[,] cleared [Matson] to return to work as of 8/27/16," because his treatment had been "successful" and "he does not pose a risk to himself or anyone else." (*Id.*).

A second letter, also dated August 30 but signed by Dy Wolpert, stated:

> Elvis Matson has been under my care from 7/27/2016 to 10/20/2016 and would be able to go back to work on 10/21/2016. He is able to perform all duties. If there's questions regarding this matter please don't hesitate to call me at (602)300-8135. Thank You!

(*Id.* at 87). This second letter was not on Red Rock letterhead. (*Id.*). It is unclear whether Sanderson Farms received this letter.

On September 7, 2016, Matson emailed Sanderson Farms a third return-to-work letter, over his personal email. Matson told Sanderson Farms that this third letter came "from [his] doctor to return to work on September 21, 2016." (*Id.* at 93). The third letter stated that "[Matson] is released to Return To Work on 9/21/2016," without any restrictions. (*Id.* at 91). That letter showed that it came "from the desk of Dr Dy Wolpert" on "1234 Main Street Anytown, State Zip (123) 456-7890." (*Id.*). Dy Wolpert's name was signed on the third letter, but the signature did not match his earlier ones. (*Id.*). The signature block listed Dy Wolpert's address as "323 W. Roosevelt St., Suite 100," in Phoenix, Arizona, and provided a phone number. (*Id.*).

Casey Laub emailed Baker about the third letter, asking him to "confirm its accuracy" because she was "confused as to what has changed since we received the full release from" Red Rock on August 30. (*Id.* at 93). Baker responded by email:

> Casey I can assure you that this document did not come from our doctor. If you look at the bottom of the document it states 1234 Main Street, Any Town, State ZIP (123) 456-7890[.]
>
> This is obviously not a document from our doctor and if you look at the signatures you [c]an see that it does not match the document that I sent you and it is not on our letter head. I have no idea what is going on.

(*Id.*).

On September 9, 2016, Sanderson Farms fired Matson for falsifying a doctor's statement, based on Red Rock's assurance that the third letter was not from their doctor's office. (*Id.* at 96–97). Amberly Sherwood told Matson that he was fired, and explained why, in a meeting that day. (Docket Entry No. 23 at 89–95). Matson responded, "I wonder what's wrong with Dr. Wolpert? That's what he sent me." (*Id.* at 91). When Matson asked how he could "authenticate th[e] note," Sherwood responded that "[t]here is nothing that you can do at this point to authenticate it because we've already done that and [Red Rock] told us it is not authentic." (*Id.* at 93). That evening, Jeffrey Baker emailed Casey Laub, copying Erika Heckman, stating that the third letter "may" have come "from Dr. Wolpert" and that Red Rock was investigating. (Docket Entry No. 18-1 at 99).

On September 12, three days after Matson's firing, Erika Heckman, the Red Rock Program Director, emailed Amberly Sherwood, the Field Employee Relations Manager at the Sanderson Farms Bryan Facility, stating:

> Please contact me at your earliest convenience. I have information that you were misinformed about a letter that [Matson] submitted to the HR department and as a result of the misinformation, [Matson] was terminated. I wish to set the record straight as well as to provide any necessary documentation to correct the original misinformation.

(Docket Entry No. 23 at 70).

Amberly Sherwood and Casey Laub passed this information on to Jennifer Buster, the Sanderson Farms Manager of Corporate Human Resources. She reviewed the return-to-work letters, tried to reach Wolpert, and talked to with Erika Heckman. (Docket Entry No. 18-1 at 146–47). Buster kept notes from her conversation with Heckman. The notes stated that Jeffrey Baker

had been fired, Dy Wolpert wrote the third letter, and the third letter should have been sent through Red Rock, but was not. (*Id.* at 150).

On September 30, 2016, after investigating, Buster concluded that "Matson should be reinstated" and instructed Amberly Sherwood and Casey Laub "to contact Matson and begin the reinstatement process." (*Id.* at 147; *see also* Docket Entry No. 23 at 74). That same day, Casey Laub sent Matson an email, stating:

> Elvis: I tried to call you this morning but was unable to reach you at the number I have on file . . . . I need for you to come in today and sign 2 forms for me. One is a return to work agreement and the other is a consent form. I will then set you up to go and see the company's substance abuse professional for recommendations regarding returning to work.

(Docket Entry No. 18-1 at 103). On October 3, 2016, having not heard from Matson, Amberly Sherwood emailed Matson that she "need[ed him] to contact [her] regarding the paperwork needed to reinstate you." (*Id.* at 105).

On October 4, 2016, the EEOC sent Sanderson Farms notice that Matson was filing an employment-discrimination charge, alleging that Sanderson Farms had discriminated against Matson based on race and disability, and had retaliated against him. (Docket Entry No. 23 at 198).

Casey Laub and Amberly Sherwood talked to Matson by phone on October 6, 2016. They told Matson that he needed to report to work on October 7 or 10 to complete the steps required for reinstatement. (Docket Entry No. 18-1 at 109, 123–24, 142). Sanderson Farms reinstated Matson's employment on October 6, subject to Matson reporting on October 7 or 10. (*Id.* at 101).

Matson sent Amberly Sherwood an email on October 6, stating:

> Pursuant to our conversation this morning regarding my wrongful termination, may I reiterate that due to undue hardships, caring for my spouse, other personal obligations, and previously scheduled medical appointments that we already have for this month, I am not available to travel to the office to complete the required paperwork for my reinstatement. However, I do wish to cooperate so that the reinstatement paperwork can be executed in a timely manner. Therefore, I would

appreciate it if you would e-mail or mail me the required paperwork and I will sign and return them to you promptly via e-mail and the hard copy will be mailed to you by U.S. Certified Mail. Thereafter, I will meet with you on October 31, 2016[,] to proceed through the reinstatement process.

(*Id.* at 107).

Matson did not go to Sanderson Farms on October 7 or 10 to see the mental-health professional or to complete the return-to-work agreement and consent forms, as Sanderson Farms requested. Brenda Gatlin tried to call Matson on October 10, but he did not answer. (Docket Entry No. 23 at 67). Matson instead emailed Gatlin on the afternoon of October 10, asking that Sanderson Farms email him the paperwork and allow him to come in on October 31. (Docket Entry No. 18-1 at 109). Matson stated that he preferred "not to communicate with Amberly [Sherwood] because [he is] in this predicament as a result of her discriminatory and retaliatory actions against [him] when she wrongfully terminated [him]." (*Id.*). In his deposition testimony, Matson explained that he had other employment commitments until October 31. (*Id.* at 40).

On October 11, Brenda Gatlin emailed Matson to say that she had called him again the day before and left a voice message "asking that [he] give Amberly a call," but no one had heard from him. (*Id.* at 109). The email stated that because Matson had failed to "comply with [Sanderson Farms's] request to report," it "ha[d] no alternative but to terminate [his] employment . . . effective today, October 11, 2016." (*Id.*).

Sanderson Farms fired Matson on October 11, 2016. The stated reason was that he had failed "to return from leave" on the specified dates, October 7 or October 10. (*Id.* at 112).

On October 11, Matson filed his EEOC charge, alleging race and disability discrimination and retaliation. (*Id.* at 114). The charge alleged that in June 2016, Amberly Sherwood began to discriminate by rejecting Matson's "Dr. releases to return to work"; requiring FMLA leave forms to be on Sanderson Farms preprinted forms; requesting information protected "under HIP[A]A

laws"; continuously contacting Red Rock and Matson's wife; accusing him of falsifying a doctor's statement; and firing him. (*Id.*). The charge alleged that Matson informed Sanderson Farms of his "discriminatory termination," but received no response. (*Id.* at 115). According to the charge, Matson's "coworkers requesting time off due to a disability received their leave with no problems; the only difference is that [he] was the only Black mechanic in the department." (*Id.*).

The parties have not submitted a right-to-sue letter, and the outcome of Matson's EEOC charge is unclear. Presumably Matson did not receive the agency relief he sought, because he sued in federal court in July 2018, asserting FMLA violations, disability and race discrimination, and retaliation. (Docket Entry No. 1 at 6–10). Matson's complaint alleges that, during his approved FMLA leave, Amberly Sherwood and Casey Laub "continuously called and emailed . . . Red Rock requesting information about [Matson's] medical condition and status." (*Id.* at 2). Even after Matson provided a letter from Dy Wolpert stating that he could return to work on October 21, 2016, the complaint alleges, Sanderson Farms "continued to call [Matson] and his wife to ask when he would be returning to work." (*Id.* at 3). Because of this "pressure to return to work," Matson asked to "return to work sooner than October 21," and Dy Wolpert gave him a letter releasing him for work on September 21, 2016. (*Id.*).

According to the complaint, when Matson forwarded the letter to Sanderson Farms, it fired him on September 9 for falsifying a doctor's statement, without "calling the number provided by [Dy Wolpert] in the letter," despite Matson's requests. (*Id.* at 3–4). The complaint alleges that, after Matson was fired, Red Rock representatives contacted Sanderson Farms to explain that the letter from Dy Wolpert "was not fraudulent," but Sanderson Farms did not respond. (*Id.* at 4). The complaint alleges that Sanderson Farms representatives spoke with Red Rock representatives on September 26, 2016, and then tried to reinstate Matson. (*Id.* at 5). On October 6, the complaint

alleges, Sanderson Farms asked Matson to return to work on October 7 or 10, but Matson responded that he could not report until October 31 "because of other employment commitments." (*Id.*). There is no allegation that on October 7 or 10, Matson had any health reason preventing him from returning to work at Sanderson Farms. Sanderson Farms terminated Matson's employment again on October 11 after he did not report on October 7 or 10. (*Id.*).

Sanderson Farms answered and, after discovery, moved for summary judgment. (Docket Entry Nos. 5, 18). Sanderson Farms argues that Matson's FMLA claims fail because Sanderson Farms granted Matson the leave he sought; there was no causal link between Matson's request for leave and his firing; and Red Rock's assurance that the September 7 return-to-work letter was not from Dy Wolpert created a legitimate and nondiscriminatory basis to fire Matson. (Docket Entry No. 18 at 21–25). As for discrimination and retaliation, Sanderson Farms contends that he has not exhausted any claims related to the October 11 firing; and the race and disability discrimination claims fail because the undisputed record evidence shows that he was not qualified to work as a master mechanic, he was not terminated because of mental-health issues, Sanderson Farms did not treat him less favorably than non-African-American employees, and Sanderson Farms had a legitimate and nondiscriminatory reason for firing him. (Docket Entry No. 18 at 25–34).

Matson responds that Sanderson Farms discouraged him from taking and remaining on FMLA leave by requiring Red Rock to use Sanderson Farms's preprinted FMLA form, requesting information about Matson's diagnosis, pressuring him to come back to work before his leave ended, asking Jeffrey Baker to authenticate Dy Wolpert's third return-to-work letter without Matson's permission, and twice terminating Matson. (Docket Entry No. 22 at 14–21). Matson argues that he administratively exhausted his claims arising from the October 11 filing because they reasonably grew out of his EEOC charge allegations. (*Id.* at 21–22, 26–27). Matson contends

that he made a *prima facie* showing of disability and race discrimination because he was qualified to work as a master mechanic; Sanderson Farms fired him because of his "mental health issues," not schizophrenia, and the record supports a reasonable inference that Sanderson Farms knew of those medical issues; Sanderson Farms used Dy Wolpert's third return-to-work letter as a pretext to fire him; and he "was the only black employee in the shop" and no non-African American employee was "terminated for the same reasons [Sanderson Farms] claims it terminated Matson." (*Id.* at 22–28).

Sanderson Farms replied, submitting documents that included the Arizona State Board of Nursing investigation of Dy Wolpert. (Docket Entry Nos. 26–26-1). Sanderson Farms argues that Matson has raised FMLA violations in the response that he did not allege in the complaint; the law permits Sanderson Farms to ask for FMLA certifications on preprinted forms and to contact medical providers to "clarify and authenticate" certification forms and return-to-work letters; and Sanderson Farms did not have to hold Matson's position open after Red Rock released him for work on August 26 in the first return-to-work letter. (Docket Entry No. 26 at 7–12). Sanderson Farms reiterated that it had legitimate and nondiscriminatory reasons for firing Matson on September 9 and October 11. (*Id.* at 12–17). Matson surreplied with a timeline of relevant events in August and September 2016, arguing that he was ready to return to work on September 21, 2016, as permitted by Dy Wolpert's September 7 return-to-work letter. (Docket Entry No. 31 at 1–3).

The parties' arguments are considered below.

## II.    The Summary Judgment Standard

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

*Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 610 (5th Cir. 2018) (quotations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial." *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Auston v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate "the precise manner in which" that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*,

19 F.3d 1527, 1537 (5th Cir. 1994)). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments, L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). "Credibility determinations have no place in summary judgment proceedings because a non-movant[']s summary judgment evidence must be taken as true." *Rideau v. Lafayette Health Ventures, Inc.*, 18-CV-473, 2019 WL 2167894, at *10 (E.D. La. May 17, 2019) (citing *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019)).

## III.  Analysis

Matson's claims fall into two categories. The first concerns Sanderson Farms's alleged violation of FMLA and Health Insurance Portability and Accountability Act procedures, and interference with Matson's FMLA leave, by communicating with Red Rock about Matson's FMLA certification forms and pressuring Matson to return to work. The second involves Sanderson Farms's alleged discriminatory and retaliatory motives for firing Matson on September 9 and October 11. The court address each separately, looking first at Sanderson Farms's alleged procedural violations and interference, then considering Matson's claims that Sanderson Farms fired him because of his race and disability, and in retaliation for his protected activities. Both categories apply the usual framework to the record evidence.

### A.  The Burden-Shifting Framework

If Matson makes a *prima facie* showing of discrimination or retaliation, the burden shifts to Sanderson Farms to articulate "a legitimate non-discriminatory reason" for the challenged

actions. *Caldwell v. KHOU-TV*, 850 F.3d 237, 241–42 (5th Cir. 2017) (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016)). If Sanderson Farms states "a legitimate rationale for its employment action, the inference of discrimination [or retaliation] disappears and [Matson] must present evidence that [Sanderson Farms's] proffered reason was mere pretext." *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004). While Matson's FMLA, ADA, and Title VII claims vary in their *prima facie* elements,[2] none provides relief if Sanderson Farms's actions were "for valid reasons unrelated to any alleged discriminatory or unlawful motive," and those reasons were not a pretext for discrimination or retaliation. *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 & n.2 (5th Cir. 2016); *see Roberson-King v. La. Workforce Comm'n, Office of Workforce Dev.*, 904 F.3d 377, 381 (5th Cir. 2018) (Title VII discrimination); *Caldwell*, 850 F.3d at 245 (FMLA interference); *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 219–20 (5th Cir. 2016) (Title VII retaliation); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (ADA discrimination); *Feist v. La., Dep't of Justice, Officer of the Attorney Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (ADA retaliation); *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332–33 (5th Cir. 2005) (FMLA retaliation).

A mixed-motive framework applies to retaliatory discharge cases "in which the employee concedes that discrimination was not the *sole* reason for [his] discharge, but argues that discrimination was *a* motivating factor in [his] termination." *Monitronics*, 434 F.3d at 333 (emphasis in original). "Within the mixed-motive framework, (1) the employee must make a *prima facie* case of discrimination; (2) the employer must articulate a legitimate, non-

---

[2] The court need not separately analyze Matson's § 1981 claim "because 'when used as parallel causes of action, Title VII and Section 1981 require the same proof to establish liability,' and 'it would be redundant to refer to both of them.'" *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 n.3 (5th Cir. 2016) (alterations omitted) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999)).

discriminatory reason for the adverse employment action; and (3) the employee must offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or . . . (b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination." *Id.* "If the employee proves that discrimination was *a* motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus." *Id.* (emphasis in original); *see Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

Matson "may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010) (quotations omitted). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Caldwell*, 850 F.3d at 242 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). On summary judgment, Matson must show "a genuine issue of fact regarding pretext." *Id.* (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 646 (5th Cir. 1985)); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–143 (2000).

### B.     The FMLA Procedural Claims

"The FMLA requires a covered employer to allow an eligible employee up to twelve weeks of unpaid leave if the employee suffers from 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Caldwell*, 850 F.3d at 245 (quoting *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001)). "To ensure employees the right to take leave, the FMLA prohibits an employer from 'interfering with, restraining, or denying the exercise of or attempt to exercise, any right' [under it]." *Id.* (quoting

29 U.S.C. § 2615(a)(1)). To make a *prima facie* showing of interference under the FMLA, a plaintiff must allege facts showing that: (1) he was an eligible employee; (2) his employer was subject to the FMLA; (3) he is entitled to leave; (4) he gave proper notice of his intent to take leave; and (5) his employer denied him benefits under the FMLA. *Id.* (citing *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013)).

The parties have not disputed that: Matson was an eligible employee; the FMLA applies to Sanderson Farms; Matson had a serious medical condition entitling him to leave; Matson gave proper notice of his leave; or that Sanderson Farms granted Matson's leave request. Matson instead asserts that Sanderson Farms interfered with his FMLA leave by communicating with Red Rock about his FMLA certification forms, and by pressuring him to return to work before his leave ended. (*See* Docket Entry No. 1 at 7; Docket Entry No. 22 at 14–21). According to Sanderson Farms, the law permitted its communications with Red Rock and the record does not support a reasonable inference that Sanderson Farms pressured him to return to work. (Docket Entry No. 18 at 23–25; Docket Entry No. 26 at 7–10).

### 1. The FMLA Certification Forms

Employers may require employees to submit certification forms from medical providers to support FMLA leave. *See* 29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a). To be "sufficient," a certification form must contain: (1) the date on which the serious health condition began; (2) the likely duration of the condition; (3) the appropriate medical facts within the health-care provider's knowledge about the condition; and (4), if the employee has the condition, "a statement that the employee is unable to perform the functions of the position." 29 U.S.C. § 2613(b)(1)–(3), (4)(B). "The medical facts must be sufficient to support the need for leave," and may include "information on symptoms, diagnosis, hospitalization, doctor visits, whether medication has been prescribed,

any referrals for evaluation or treatment . . . , or any other regimen or continuing treatment." 29 C.F.R. § 825.306(a)(3). "A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive." *Id.* § 825.305(c). The employer must inform "an employee whenever the employer finds a certification incomplete or insufficient," and has to "state in writing what additional information is necessary to make the certification complete and sufficient." *Id.*

"[I]t is the employee's responsibility either to furnish a complete and sufficient certification or to furnish the health care provider . . . with any necessary authorization from the employee or the employee's family in order for the health care provider to release a complete and sufficient certification to the employer to support the employee's FMLA request." *Id.* § 825.305(d). If the certification is complete and sufficient, "the employer may not request additional information" from the health care provider. *Id.* § 825.307(a). The employer may contact the health care provider for "clarification and authentication," only "after the employer has given [the employee] the opportunity to cure any deficiencies." *Id.*

Clarification "means contacting the health care provider to understand the handwriting on the medical certification or to understand the meaning of a response." *Id.* Authentication "means providing the health care provider with a copy of the certification and requesting verification that the information contained on the certification was completed and/or authorized by the health care provider." *Id.* "Employers may not ask health care providers for additional information beyond that required by the certification form" and must follow HIPAA requirements in receiving information from "a HIPAA-covered health care provider." *Id.*; *see Holladay v. Rockwell Collins, Inc.*, 357 F. Supp. 3d 848, 861 (S.D. Iowa 2019) ("FMLA regulations limit what information employers may seek in such a certification, but generally employers can ask for information as to

the identity and specialization of the health care provider, the onset date of the condition, and medical facts and other information supporting the need for leave.").

The FMLA also permits an employer to seek a "fitness-for-duty certification" for "the particular health condition that caused the employee's need for FMLA leave." 29 C.F.R. § 825.312(b). "The employee has the same obligations to participate and cooperate (including providing a complete and sufficient certification or providing sufficient authorization to the health care provider to provide the information directly to the employer) in the fitness-for-duty certification process as in the initial certification process." *Id.* § 825.312(a). As with initial certification forms, the employer may contact a health care provider to clarify or authenticate the fitness-for-duty certification after giving the employee a chance to cure any deficiencies. *Id.* § 825.312(b).

Matson testified in his deposition that when he left for Arizona on July 23, 2016, and began his treatment, he was not allowed "to talk to anyone" over the phone because of his "mental state." (Docket Entry No. 23 at 12). According to Matson, Red Rock allowed him to speak with Amberly Sherwood only once, through a "three-way" call. (*Id.*). It was during that call that Sherwood told Matson that the form "didn't reveal enough information" and asked that the FMLA certification be completed using the Sanderson Farms preprinted FMLA form. (*Id.*).

The record shows that Red Rock gave Sanderson Farms two certifications. Both were plainly insufficient. Instead of a valid contact number for Dy Wolpert, the certifications listed Sanderson Farms's number. (Docket Entry No. 18-1 at 127–35). Rather than stating "medical facts" to support Matson's need for medical leave, 29 U.S.C. § 2613(b); 29 C.F.R. § 825.306(a)(3), the certifications tersely stated: "Pt hospitalized due to life threatening condition[s]." (Docket Entry No. 18-1 at 127–35). The certification forms asked for "functions the employee is unable

to perform"; the certifications Red Rock sent stated, "No work off work." (*Id.* at 128, 133). The certifications did not state the date when Matson's serious medical condition began, but mentioned only that Dy Wolpert treated Matson from July 20 to 25, 2016. (*Id.*). Because of these "vague," "ambiguous," unintelligible, or "non-responsive" answers, the certifications were neither sufficient nor complete. 29 C.F.R. § 825.305(c); *see Coffman v. Ford Motor Co.*, 447 F. App'x 691, 696 (6th Cir. 2011) ("A valid certification 'must show that the employee's serious health condition makes her unable to perform job functions.'" (quoting *Hoffman v. Prof'l Med Team*, 394 F.3d 414, 419 (6th Cir. 2005))); *see also Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 578 (6th Cir. 2007) ("Dr. Wloszek's first certification form did not contain the date on which the serious health condition began, the probable duration of the condition, or the appropriate medical facts within the health care provider's knowledge; as a result, this certification was not sufficient under 29 C.F.R. § 2613(b), and [the employer] was not required to credit it.").[3]

The FMLA regulations required Sanderson Farms to inform Matson in writing that the certifications were insufficient, describing "what additional information is necessary to make the certification complete and sufficient." 29 C.F.R. § 825.305(c). Unless Matson had authorized Sanderson Farms to communicate directly with Red Rock, which he denies, Sanderson Farms could not contact Red Rock until seven days after giving Matson the written notice and only for "authentication" or "clarification."[4] *Id.* §§ 825.306(e), 825.307(a). Sanderson Farms has not

---

[3] Matson's argument that Sanderson Farm's violated FMLA regulations by requesting that the certification be on its preprinted form, (Docket Entry No. 22 at 15), is unpersuasive. Matson has not identified a statute, regulation, or case prohibiting a preprinted form. The FMLA regulations permit an employer to use "Form WH-380-E . . . or another form containing the same basic information," as long as no additional information was sought. 29 C.F.R. § 825.306(b).

[4] Matson testified that he did not give Red Rock permission to release medical information to Sanderson Farms. (Docket Entry No. 23 at 15). He also testified that he did not know if Sanderson Farms was aware that Red Rock did not have Matson's permission. (*Id.*).

submitted or identified evidence that it sent the written notice. Nor has it argued that Matson authorized Sanderson Farms representatives to communicate with Red Rock. Sanderson Farms nonetheless sought clarification from Red Rock, received information from Red Rock about Sanderson's serious health condition and treatment, and promptly granted Matson's FMLA leave request.

But the FMLA provides a remedy only for those violations that "interfered with or restrained an employee's rights." *Smith v. Hope Sch.*, 560 F.3d 694, 698 n.4 (7th Cir. 2009) (citing *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 909–10 (7th Cir. 2008)); *see Bell v. Dall. Cty.*, 432 F. App'x 330, 334 (5th Cir. 2011) ("With an interference claim, an employee must show that he was denied his entitlements under the FMLA, or, that an employer did not respect the employee's FMLA entitlements."). Even an FMLA claim based on a failure to follow regulatory requirements requires the employee to show that the failure denied, interfered with, or restrained the employee's FMLA rights. *See, e.g.*, *Quinn v. St. Louis Cty.*, 653 F.3d 745, 753–54 (8th Cir. 2011) (to state an interference claim, "the employee must also show that the employer denied the employee entitlements under the FMLA"); *De La Garza-Crooks v. AT&T*, Civ. A. No. 00-50969, 2001 WL 361099, at *1 (5th Cir. Mar. 22, 2001) (per curiam) ("Generally, proof of injury under the FMLA requires evidence that the plaintiff was denied FMLA leave improperly."); *Cozad v. Ill. Dep't of Corr.*, No. 16-CV-4131, 2018 WL 2758261, at *5 (C.D. Ill. Apr. 17, 2018) ("Plaintiff cannot prevail on her interference claim because she cannot show she was denied FMLA benefits to which she was entitled."); *Smith v. The Hope Sch.*, Civ. A. No. 06-3244, 2008 WL 1722194, at *6 (C.D. Ill. Apr. 10, 2008) ("[W]hile other statutes may provide Smith recourse for Hope School's violation, the FMLA provides no remedy unless the action interfered with, restrained, or denied Smith's exercise of her rights under the FMLA.").

"[A]n employee must show that the defendant 'interfered with, restrained, or denied her exercise or attempt to exercise FMLA rights, and that the violation prejudiced her.'" *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 209 (5th Cir. 2018) (quoting *Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 770 (5th Cir. 2015)); *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) ("An interference claim merely requires proof that the employer denied the employee its entitlements under the FMLA." (quotation omitted)).  "Even if a reasonable jury could find that an employer interfered, restrained, or denied the exercise of FMLA rights, the employee must still point to evidence of prejudice in order to recover." *Jones v. Children's Hosp.*, 58 F. Supp. 3d 656, 668–69 (E.D. La. 2014) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 82 (2002)).  "Prejudice exists when an employee losses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, such as the cost of providing care, or suffers some loss in employment status such that equitable relief is appropriate." *Id.*

Matson has not submitted or identified evidence supporting a reasonable inference that Sanderson Farms's communications with Red Rock about the certifications interfered with, or denied, his FMLA rights.  The record shows that Sanderson Farms granted Matson his FMLA leave after exchanging emails with Red Rock and obtaining a "description of appropriate medical facts regarding [Matson's] health condition," required information on a FMLA certification form. 29 C.F.R. § 825.306(a)(3).  While Sanderson Farms may have violated the regulation by asking Red Rock to provide this information without first giving Matson seven days to cure the certification form deficiencies, that violation benefitted rather than prejudiced Matson because Sanderson Farms granted him leave as a result.  *See Harcourt v. Cincinnati Bell Tel. Co.*, 383 F. Supp. 2d 944, 956 (S.D. Ohio 2005) ("One of the goals of the FMLA is to allow an employee to

obtain needed medical leave in a swift and expeditious manner upon presentation of an adequate certification.").[5] And even assuming that the violation interfered with or denied Matson's FMLA rights, Matson has not pointed to evidence supporting a reasonable inference that he lost compensation or benefits "by reason of the violation." *Jones*, 58 F. Supp. 3d at 668–69.

The undisputed record evidence shows that as a matter law, Matson is not entitled to recover on his claims that Sanderson Farms interfered with his FMLA rights by communicating with Red Rock about the certification forms without notifying him in writing. Summary judgment is granted on these claims.[6]

### 2. Pressure to Return from Leave

"The term 'interference with' includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Bell*, 432 F. App'x at 334 (quoting 29 C.F.R. § 825.220(b)); *see Forbes v. Unit Tex. Drilling, L.L.C.*, 526 F. App'x 376, 379 (5th Cir. 2013); *Elsayed v. Univ. of Hous.*, No H-11-3636, 2012 WL 2870699, at *3 (S.D. Tex. July 11, 2012). "[T]he Fifth Circuit has indicated that for FMLA interference claims based on discouragement to be actionable, the plaintiff must not take leave or must take less leave because of the discouragement." *Gomez v. Office Ally, Inc.*, No. 18-CV-1101, 2019 WL 2774367, at *5 (W.D. Tex. July 1, 2019) (citing *Eaton-Stephens v. Grapevine Colleyville Indep. Sch. Dist.*, 715 F. App'x 351, 357 (5th Cir. 2017)); *see also Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012).

---

[5] To the extent that Matson asserted HIPAA violations in his response, (Docket Entry No. 22 at 16–17), he did not cite which HIPAA provisions Sanderson Farms allegedly violated, and the complaint did not assert HIPAA violations. The court has no basis to consider or rule on these alleged violations.

[6] In Part C.2.i, *infra*, the court addresses Matson's assertion that Sanderson Farms "violated [the] FMLA by contacting [Jeffrey] Baker, who is not a health care provider, instead of [Dy Wolpert,] to authenticate the September 7, 2016[,] letter," because it is intertwined with the claims arising from Matson's firing. (Docket Entry No. 1 at 7).

In his deposition, Matson testified that he spoke with Sanderson Farms once by phone during his time at Red Rock. (Docket Entry No. 23 at 12). In that call, Matson discussed the FMLA certification forms with Amberly Sherwood, the Field Employee Relations Manager at the Sanderson Farms Bryan Facility, because "she wanted . . . this information put on the Sanderson Farms FMLA paper." (*Id.*). Matson characterized Amberly Sherwood's tone on the call as "nasty" and "disruptive," but he acknowledged that she "approved" his leave. (*Id.* at 12–14). After this phone conversation, Amberly Sherwood did not contact Matson again until after his release from Red Rock. (*Id.* at 13).

Matson testified that Red Rock released him on August 26, 2016, as stated in the August 30 return-to-work letter on Red Rock letterhead, and that he informed his Sanderson Farms supervisor that he was "thinking about coming off of leave." (*Id.* at 15). The August 30 Red Rock letter stated:

> This is a letter serves [sic] as a confirmation that . . . Elvis Matson successfully completed our Residential Substance Abuse Treatment program and Partial Hospitalization Program with Sober Living Housing on August 26th, 2016.
>
> While at the Clinic, Elvis participated freely and completed the program successfully. The doctor, Dr. Dy Wolpert[,] cleared [Matson] to return to work as of 8/27/16. His discharge was again successful and was determined by his multi-disciplinary team and finds that he does not pose a risk to himself or anyone else at the time of discharge.

(*Id.* at 183). Jeffery Baker and Erika Heckman at Red Rock signed this letter; Dy Wolpert did not. (*Id.*).

When Sanderson Farms received the letter from Red Rock, Amberly Sherwood called Matson and asked for a return-to-work letter from Dy Wolpert, his listed health care provider. (*Id.* at 16); *see* 29 C.F.R. §§ 825.102 (a health care provider means "a doctor of medicine" or "[o]thers 'capable of providing health care services,'" including "[n]urse practitioners"), 825.312(a)–(b) (an

employer may require a fitness-for-duty certification from the employee's health-care provider). In his affidavit, Matson stated that he obtained a letter from Dy Wolpert, and then called Amberly Sherwood to tell her that the letter authorized him to return on October 21, 2016, the date his FMLA leave expired. (*Id.* at 83). According to Matson, Amberly Sherwood responded that he "could not stay out that long and that [he] had to come back sooner." (*Id.*). Amberly Sherwood "didn't twist [his] arm or nothing," Matson acknowledged, but he began to "fear [for his] job." (*Id.* at 16). Matson decided that he had "to go back to work." (*Id.* at 20). Matson asked Dy Wolpert for another return-to-work letter with an earlier return date. Dy Wolpert sent him one by email, allowing Matson to return on September 21, 2016, a month earlier, without limitation or restriction. (*Id.* at 83–84).

The FMLA "contemplates circumstances where the date of an employee's return from FMLA leave may change." *Johnson v. Hous. Rests., Inc.*, No. H-03-4566, 2005 WL 6122130, at *3 (S.D. Tex. Feb. 17, 2005); *see* 29 C.F.R. § 825.311. "[A]n employee may discover after beginning leave that the circumstances have changed and the amount of leave originally anticipated is no longer necessary." *Johnson*, 2005 WL 6122130, at *3. "Ordinarily, the employer and employee will communicate and establish the return date for an employee taking FMLA leave." *Id.* The employer may "require an employee on FMLA leave to report periodically on the employee's status and intent to return to work." *Id.* (quoting 29 C.F.R. § 825.309). "[W]hen an employee is no longer suffering from a serious health condition which necessitates [the employee's] absence from work, such employee can lose her eligibility for FMLA protection." *Ford-Evans v. United Space All., LLC*, No. 04-CV-3344, 2007 WL 4413716, at *3 (S.D. Tex. Dec. 14, 2007) (citing *Murray v. Red Kap Indus., Inc.*, 124 F.3d 695, 698 (5th Cir. 1997)).

Even assuming that Matson has made a *prima facie* showing that Sanderson Farms discouraged him from using his authorized FMLA leave, Sanderson Farms had a legitimate and nondiscriminatory reason for believing that Matson could return to work earlier than anticipated in the authentication forms from Red Rock, based on Red Rock's August 30 letter. (Docket Entry No. 23 at 183). Sanderson Farms had a reasonable basis to believe that Matson had completed his treatment program; Matson's serious health condition was no longer a danger to himself or others; he had been cleared to return to work without restrictions by his health care provider; and he "was thinking about coming off of leave." (*Id.* at 15). This evidence shows that Sanderson Farms had a legitimate and nondiscriminatory reason for informing Matson that October 21, almost two months after Matson's release from Red Rock, was not his return-to-work date, but instead would be earlier.

The burden shifts back to Matson to identify or submit evidence supporting a reasonable inference, or raising factual disputes material to finding, that Sanderson Farms's reason was pretextual. Matson points to his August 30 letter from Dy Wolpert, but he has not identified or submitted evidence supporting a reasonable inference that Matson sent that letter to Sanderson Farms after speaking with Amberly Sherwood, or that he described the contents. Even if the letter was sent or conveyed, it was clearly insufficient. It did not provide "medical facts" showing that Matson could do his "essential [job] functions," or explain why he was unable to do them until October 21, despite the August 30 Red Rock letter clearing him to return to his full duties. 29 C.F.R. § 825.306(a)(3)–(4). Accepting as true Matson's deposition testimony that Amberly Sherwood was "nasty" over the phone and made repeated "disruptive" calls to him about FMLA issues, unpleasantness or repeated contact, standing alone, does not support a reasonable inference that Sanderson Farms's reasons for the challenged actions were a pretext for discouraging Matson

from exercising his FMLA rights. That is particularly true when, as here, the employee's FMLA request was granted and he had successfully completed his treatment program for the medical condition. (Docket Entry No. 23 at 13–14). Summary judgment is granted as to Matson's claim that Sanderson Farms discouraged his FMLA leave.

## C.    The Discrimination and Retaliation Claims

### 1.    Administrative Exhaustion

Sanderson Farms argues that Matson did not timely file his EEOC charge and did not exhaust his administrative remedies for Title VII or ADA claims from his second firing on October 11.[7] (Docket Entry No. 18 at 25–26). Sanderson Farms argues that the EEOC charge did not mention the October 11, 2016, firing, which it characterizes as "a separate and distinct employment action." (*Id.* at 26). Matson argues that the EEOC investigation could have reasonably grown to encompass the October 11 firing because it came after Sanderson Farms tried to reinstate him after the September 9 firing, and because the parties discussed the October 11 firing in the briefs they filed before the EEOC. (Docket Entry No. 22 at 21–22).

Plaintiffs asserting Title VII and ADA claims must first exhaust their administrative remedies with the EEOC, state, or local agency. *Davis v. Fort Bend Cty.*, 893 F.3d 300, 307 (5th Cir. 2018); *Williamson v. Am. Nat'l Ins. Co.*, 695 F. Supp. 2d 431, 444–45 (S.D. Tex. 2010). The exhaustion requirement is not jurisdictional, and a "[f]ailure to exhaust is an affirmative defense that should be pleaded." *Davis*, 893 F.3d at 307; *see Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1850–51 (2019).

---

[7] "There is no requirement under the FMLA to exhaust claims before the EEOC." *Ellis v. Educ. Comm'n for Foreign Med. Graduates*, No. H-14-2126, 2015 WL 3866728, at *9 (S.D. Tex. June 23, 2015); *see also Zavala v. Silverleaf Resorts, Inc.*, No. 16-CV-3186, 2018 WL 6252551, at *2 (N.D. Tex. Nov. 2, 2016) ("[T]he FMLA does not require plaintiffs to exhaust their administrative remedies prior to filing a lawsuit."), *recommendation and report adopted by* No. 16-CV-3186, 2018 WL 6250547 (N.D. Tex. Nov. 29, 2018).

After a plaintiff receives a right-to-sue letter, the plaintiff may sue in federal district court on allegations limited to "the plaintiff's administrative charge and to the EEOC investigation that can reasonably be expected to grow out of [it]." *Williamson*, 695 F. Supp. 2d at 445 (citing *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)); *see also Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017). The lawsuit "can include only those allegations that are like or related to those allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the [administrative agency]." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018) (alterations and quotation omitted). To determine what claims have been exhausted, the court must "engage in a fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco*, 448 F.3d at 789.

The parties have submitted Matson's EEOC charge and Sanderson Farms's response, but no right-to-sue letter. On the EEOC charge, Matson checked the boxes for race and disability discrimination and retaliation. (Docket Entry No. 18-1 at 114). The EEOC charge alleged that Amberly Sherwood began "discriminating, and rejecting all [Matson's] Dr. releases to return to work" in June 2016, and that Matson went on medical leave on July 23, 2016. (*Id.*). It alleged that Amberly Sherwood and Casey Laub "continuously" called and emailed Red Rock for "information [that Red Rock] could not give under HIP[AA] laws." (*Id.*). On September 9, 2016, the EEOC charge alleged, Amberly Sherwood "accused [Matson] of falsifying [his] Dr. release" and fired him. (*Id.*). The EEOC charge asserted that Sanderson Farms fired Matson on September 9 "because of [his] race (Black), disability, and [he was] subjected to retaliation." (*Id.* at 115). Matson signed, dated, and submitted the EEOC charge on October 11, 2016. (*Id.*).

While the EEOC charge does not mention the October 11 firing, which happened on the day Matson filed the charge, these allegations are "like" and "related to" the allegations in the charge and emerged on the date the charge was filed. *Davenport*, 891 F.3d at 167. A reasonable investigation would include why Sanderson Farms tried to reinstate Matson after the September 9 firing, the reasons this reinstatement effort failed, and whether Sanderson Farms had a discriminatory or retaliatory motive for the first or second firing. Because the October 11 firing grew out of an attempt to reinstate Matson after the September 9 firing, and a reasonable investigation would have encompassed it, the EEOC charge exhausted Matson's Title VII and ADA claims related to the October 11 firing. *Patton*, 874 F.3d at 443 (claims are exhausted if they "can reasonably be expected to grow out of the charge of discrimination" (quotation omitted)).

### 2.    The Reasons for Firing Matson

Matson alleges that Sanderson Farms discriminated against him based on his race and mental-health issues, interfered with his FMLA leave by firing and failing to reinstate him, and retaliated for the leave he took, for complaining about discrimination, and for filing an EEOC charge. (Docket Entry No. 1 at 6–10; Docket Entry No. 22 at 14–28). Even assuming that Matson has made a *prima facie* showing for each of these claims, Sanderson Farms contends, Red Rock's assurance that Dy Wolpert did not write the third return-to-work letter, making it a false representation by a health care provider, was a legitimate and nondiscriminatory reason for Sanderson Farms to fire Matson on September 9. (Docket Entry No. 18 at 22–34; Docket Entry No. 26 at 5, 9, 14–17). Sanderson Farms argues that it made a good-faith effort to reinstate Matson after Red Rock later verified the third return-to-work letter, but that Matson refused to report to work on the requested dates despite the absence of any health condition preventing his return. (*Id.*).

Matson responds that these reasons were pretexts for discrimination and retaliation. (Docket Entry No. 22 at 25–26). Matson argues that the record supports a reasonable inference of pretext because Amberly Sherwood did not look at the email from Dy Wolpert when Matson tried to show it to her at the September 9 meeting, and because Jeffrey Baker told Sanderson Farms, within "hours" of Matson's firing, that Dy Wolpert "may" have written and sent the third return-to-work letter. (*Id.* at 26). Matson argues that Sanderson Farms did not give him enough time to report for reinstatement and return to work before it fired him on October 11. (*Id.* at 20).

### i. The September 9 Firing

Matson requested a return-to-work letter in September from Dy Wolpert, who emailed him a letter, dated September 7, 2016, that had obvious problems in both form and substance. As to form, the September 7 letterhead said that it came "from the desk of Dr. Dy Wolpert," not from Red Rock; Dy Wolpert's signature did not match his previous signatures; and the bottom of the letter listed an address of "1234 Main Street Anytown, State Zip (123) 456.7890." (Docket Entry No. 18-1 at 91). As to substance, the letter stated only that Matson was "released to Return To Work on 9/21/2016" without "any restrictions," and the signature block listed a Phoenix, Arizona address and phone number with no apparent affiliation to Red Rock. (*Id.*). This return-to-work letter was insufficient under the FMLA regulations because it provided no medical facts showing that Matson could perform his essential job functions, and it raised a reasonable forgery suspicion given the signature, bizarre address, lack of Red Rock affiliation, and inconsistency with the August 30 Red Rock letter.

Despite the facially apparent problems with the September 7 letter, Matson forwarded Dy Wolpert's email containing the letter to Sanderson Farms, having "barely read it." (Docket Entry No. 23 at 21). The email from Dy Wolpert came from "dywolpert@yahoo.com," not a Red-Rock

affiliated address, and stated simply: "Hi elvis. here is your letter[.]" (*Id.* at 64). Sanderson Farms reasonably questioned the letter's authenticity, and promptly sent it to Red Rock for authentication and clarification without notifying Matson. (Docket Entry No. 18-1 at 93). Jeffrey Baker responded from Red Rock the same day, September 7, stating that: "I can assure you that this document did not come from our doctor." (*Id.*). Because Sanderson Farms's policies required firing any employee who falsified a doctor's statement, Jeffery Baker's assurance that no doctor wrote the September 7 letter that Matson had sent gave Sanderson Farms a legitimate and nondiscriminatory basis to fire Matson. (Docket Entry No. 18-1 at 61); *cf. Smith*, 2008 WL 1722194, at *6 ("[C]ourts have concluded that alteration of a certification form provides grounds for termination even where the unaltered form would have entitled the employee to FMLA leave." (citing *Yasmeen v. Hospira Inc.*, No. 06-CV-507, 2007 WL 3254923, at *3 (D. Utah Nov. 2, 2007)).

Sanderson Farms did not interfere with Matson's FMLA rights by seeking to authenticate the September 7 letter without first notifying him of its deficiencies in writing. While an employer must give an employee notice and opportunity to cure an insufficient return-to-work letter, Matson's September 7 letter was not merely insufficient but suspected to be falsified. *See* 29 C.F.R. §§ 825.305(c), 825.307(a), 825.312(b). Matson had requested and obtained the letter and forwarded it to Sanderson Farms. He is presumed to have read it. Employees have no right to reinstatement after FMLA leave if they "would not otherwise have been employed at the time of reinstatement" because, for instance, they falsified FMLA documents. *Id.* §§ 825.216(a), 825.216(d) ("An employee who fraudulently obtains FMLA leave from an employer is not protected by FMLA's job restoration or maintenance of health benefits provisions."); *see The Hope Sch.*, 2008 WL 1722194, at *6 ("[N]umerous cases have held that falsification of an FMLA

certification form constitutes grounds for termination." (collecting cases)); *Yasmeen*, 2007 WL 3254923, at *4 (the FMLA does not "shield an employee from termination for allegedly falsifying an FMLA form" (quotation omitted)).

Though Sanderson Farms violated the FMLA regulations by contacting Red Rock on September 7, the assurance from Red Rock that the September 7 letter did not come from a doctor, including Dy Wolpert, gave Sanderson Farms a reasonable, legitimate, and nondiscriminatory reason to believe that Matson was not entitled to reinstatement, and Sanderson Farms could not have interfered with a FMLA right that it reasonably and in good faith did not believe Matson had.[8] *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 492 (5th Cir. 2018) ("[W]hat matters is not whether [the employer] was objectively correct about [the employee's] dishonesty, but whether it had a good-faith belief that dishonesty existed, and that such belief was the basis for the termination." (citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1165–66 (5th Cir. 1993))); *Yasmeen*, 2007 WL 3254923, at *5 ("A violation of the no-contact provision does not defeat Hospira's established defense; Hospira is still able to meet its burden by establishing that Ms. Yasmeen would have been discharged regardless of her request for, or taking of, FMLA leave.").

Nor did Sanderson Farms interfere with Matson's FMLA rights by communicating with Jeffery Baker, and not Dy Wolpert, to authenticate the September 7 letter. Jeffrey Baker was Matson's case manager at Red Rock and had regularly communicated with Sanderson Farms to provide necessary paperwork and information. Sanderson Farms had no verified contact information for Dy Wolpert, other than that provided on the September 7 letter, and no one from Sanderson Farms had spoken with Dy Wolpert during Matson's leave. It was reasonable for

---

[8] In his deposition, Matson stated that it would be "[]appropriate" for "Sanderson Farms to reach out and seek clarification" from Red Rock on the September 7 letter because "[t]hey have to do an investigation." (Docket Entry No. 18-1 at 29–30).

Sanderson Farms to contact Jeffrey Baker, Matson's case manager at the health-care facility where Dy Wolpert practiced, given the concerns about falsification. Again, even if Sanderson Farms violated FMLA regulations by doing this before notifying Matson in writing, Sanderson Farms did not interfere with Matson's right to reinstatement because it had a reasonable and good-faith basis to believe that Matson was not entitled to that right.

Sanderson Farms fired Matson on September 9, 2016, and Amberly Sherwood informed him why. (Docket Entry No. 23 at 89–95). Matson asked, "what do I need to do to verify where I was for all those months and authenticate that note?" (*Id.* at 93). Amberly Sherwood responded that "[t]here is nothing you can do at this point to authenticate it because we've already done that and [Red Rock] told us it is not authentic." (*Id.*). Matson has not pointed to evidence supporting a reasonable inference that Sanderson Farms's stated reason for firing Matson on September 7 was a pretext for retaliation or discrimination because of his disability, race, or FMLA leave.

Jeffrey Baker emailed Sanderson Farms on September 9, 2016, at 7:13 p.m., after Matson had been fired, stating that the September 7 letter "may" have come from Dy Wolpert and that Red Rock was investigating. (*Id.* at 135). The fact that Sanderson Farms did not call the number listed on the September 7 letter does not support a reasonable inference of pretext because Red Rock had already confirmed that the letter did not come from Dy Wolpert, and because Red Rock did not verify the clearly wrong phone number. Nor does the fact that Sanderson Farms took no immediate action after Jeffrey Baker's September 9 email support a reasonable inference of pretext because the email came after Matson's firing and indicated only that the September 7 letter "may" have been authentic in that it came from someone still incorrectly believed to be a doctor. (*Id.*).

Red Rock did not inform Sanderson Farms that Dy Wolpert in fact wrote the September 7 letter until September 12, three days after Matson's firing, in an email from Red Rock's Program

Director, Erika Heckman. (*Id.* at 70). According to Jennifer Buster, the Sanderson Farms Manager of Corporate Human Resources, Amberly Sherwood forwarded Erika Heckman's email to her. (Docket Entry No. 18-1 at 147). On September 16, Matson emailed Amberly Sherwood, asking Sanderson Farms to "please respond to Ms. Hickman's [sic] September 12, 2016[,] email or call her so this matter may be resolved." (Docket Entry No. 23 at 72). Amberly Sherwood again forwarded this email to Jennifer Buster, stating "I just received this email from [Matson]." (*Id.*).

Based on the emails, Jennifer Buster began investigating "the matter and [Dy] Wolpert's certification." (Docket Entry No. 18-1 at 147). She reviewed all the return-to-work letters, spoke by phone with Erika Heckman, and "attempted to reach [Dy] Wolpert, however, he refused to speak [to her]." (*Id.*). After Buster spoke with Heckman, she "decided that Matson should be reinstated," and, on September 30, "directed [Amberly] Sherwood and [Casey] Laub to contact Matson and begin the reinstatement process." (*Id.*).

Sanderson Farms investigated after Red Rock provided the new information about the September 7 letter and decided to reinstate Matson. This amply supports an inference that Sanderson Farms had earlier fired Matson because of its reasonable, good-faith belief that Matson had falsified the September 7 letter. While Matson argues that the investigation and reinstatement took too long, and that this delay supports an inference of pretext, Sanderson Farms offered Matson reinstatement less than a month after his firing and a few days after Jennifer Buster received the new information from Heckman.

Matson has not identified or submitted evidence supporting a reasonable inference that Sanderson Farms used the September 7 letter as pretext for discrimination or retaliation because

of Matson's disability, race, or FMLA leave.[9] Matson has not identified or submitted evidence that Sanderson Farms fired him on September 9, 2016, for any reason other than falsifying a doctor's statement. *See McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) ("[O]nce the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." (quotation omitted)); *Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 814 (5th Cir. 1991) (summary judgment was warranted when the only evidence of pretext was the plaintiff's "bald assertion that he ha[d] been discriminated against"); *EEOC v. Exxon Shipping Co.*, 745 F.2d 967, 976 (5th Cir. 1984) ("[P]retext cannot be established by mere 'conclusory statements' of a plaintiff who feels he has been discriminated against.").

### ii.    The October 11 Firing

On September 30, 2016, Jennifer Buster directed Amberly Sherwood and Casey Laub to contact Matson and start the reinstatement process. (Docket Entry No. 18-1 at 147). Amberly Sherwood and Casey Laub emailed Matson on September 30, and again on October 3 when they did not hear from him, stating that they had tried to reach him by phone, telling Matson that Sanderson Farms was reinstating him, and asking him to report to work so that he could sign reinstatement forms and "see the company's substance abuse professional for recommendations regarding returning to work." (Docket Entry No. 18-1 at 103–05). Red Rock had informed Sanderson Farms that Matson had been treated for alcohol and substance abuse, and Sanderson

---

[9] Matson testified that a coworker told him Amberly Sherwood was "very prejudiced and racist"; Amberly Sherwood's "problem" was that he "was black"; Amberly Sherwood "wouldn't even talk to [him]"; and Amberly Sherwood told his wife at the September 9 meeting "to sit down, girl." (Docket Entry No. 23 at 10, 18–19). This testimony does not support a reasonable inference that Sanderson Farms's reason for terminating Matson on September 9 was pretext for race discrimination. *See DeVoss*, 903 F.3d at 492 ("[An employee] cannot establish pretext solely by relying on her subjective belief that unlawful conduct occurred."); *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) ("To establish pretext, a plaintiff cannot merely rely on his subjective belief that discrimination has occurred.").

Farms's policies required an employee returning from leave for substance- or alcohol-abuse treatment to see a substance-abuse professional and to take an unannounced drug screen.[10] (*Id.* at 83, 89, 176–77).

Matson testified that he became aware that "Sanderson Farms was trying to reinstate [his] employment" on September 30, and he remembered the voicemail from Brenda Gatlin on October 3. (*Id.* at 37). Matson testified that he "wasn't in town" because, a "[c]ouple days" after his firing, he began working at his brother's trucking company in San Antonio. (*Id.* at 37–39, 43). Matson spoke to Amberly Sherwood and Casey Laub on October 6, 2016, and they told him that he had to report to work for reinstatement on either October 7 or 10. (*Id.* at 40). Matson told them that he could not report on those dates. (*Id.* at 40–41). Matson asked if the reinstatement paperwork could be emailed or mailed to him. (*Id.* at 107, 109–10). Amberly Sherwood and Casey Laub stated that Matson needed to appear in person on the specified dates. (*Id.* at 109).

On October 7, 2016, instead of reporting to Sanderson Farms, Matson went to Vallentine's Garage in Caldwell, Texas, outside San Antonio, seeking employment. (*Id.* at 117). Matson did not report to Sanderson Farms on October 10, although he did email Brenda Gatlin, stating that:

> I emailed Amberly last week regarding executing the reinstatement documents and my availability to report to Human Resources on ***October 31, 2016***. I respectfully requested that the reinstatement documents be e-mailed or mailed to me but to date, I have not received any documentation. As I mentioned in my October 6, 2016[,] email, once I receive the required documentation, I will receive and return them via Certified Mail.

---

[10] The Drug and Alcohol Policy submitted by Sanderson Farms was revised on October 15, 2018, and was not the version in effect when Matson was fired. (Docket Entry No. 18-1 at 152). But Matson has not objected to the Drug and Alcohol Policy. There is no basis to find that the 2016 and 2018 versions had material differences.

(*Id.* at 109 (emphasis in original)). On October 11, after Matson failed to report on either date, Sanderson Farms fired Matson a second time for "[f]ailure to return from leave," informing him in an email sent by Brenda Gatlin. (*Id.* at 109, 112).

Matson argues that Sanderson Farms's reinstatement offer was a "sham," and a pretext, because Sanderson Farms provided "[in]adequate notice for Matson to return to work." (Docket Entry No. 22 at 20). The record evidence does not support that argument. Because Matson did not contact Sanderson Farms until October 6, after learning of his reinstatement on September 30, he had only a few days to report to work for reinstatement. Had Matson promptly contacted Sanderson Farms, he would have had 10 days to report. Matson's EEOC charge stated that he had been out looking for work on October 3, 5, and 7, supporting a reasonable inference that he was medically able to report on October 7 or 10, but chose not to. Matson did not report on the requested dates, and he has identified no authority requiring Sanderson Farms to hold his position open after that. *See Beckendorf v. Schwegmann Giant Super Mkts., Inc.*, No. 97-30539, 1997 WL 811826, at *2 (5th Cir. Dec. 18, 1997) (per curiam) ("[O]nce [an employee's] leave expire[s], any right to restoration also expire[s] and [the employer is] no longer under any express statutory duty imposed by the FMLA to reinstate [the employee]."); *Henderson v. Grand Prairie Indep. Sch. Dist.*, No. 12-CV-498, 2013 WL 4804300, at *8 (N.D. Tex. Sept. 6, 2013) ("Although the FMLA provides a right to reinstatement to any employee on FMLA leave, '[i]f an employee fails to return to work on or before the date that FMLA leave expires, the right to reinstatement also expires.'" (quoting *Hunt*, 277 F.3d at 763)).[11]

---

[11] *See also Ainsworth v. Loudon Cty. Sch. Bd.*, 851 F. Supp. 2d 963, 977 (E.D. Va. 2012) ("[O]nce an employee exceeds the duration of her FMLA leave, the employer is not obligated by [the] FMLA to keep that position open or reinstate the employee upon her return."); *Hofferica v. St. Mary Med. Ctr.*, 817 F. Supp. 2d 569, 577 (E.D. Pa. 2011) (same); *Podkovich v. Glazer's Distrib. of Iowa, Inc.*, 446 F. Supp. 2d 982, 1006 (N.D. Iowa 2006) ("[I]f an employee fails to return, prior to, or immediately upon, the expiration of qualified FMLA leave, the right to reinstatement dissipates." (citing *Hunt*, 277 F.3d at 768)).

While the EEOC sent notice to Sanderson Farms of Matson's EEOC charge on October 4, and Matson actually filed his EEOC charge on October 11, temporal proximity alone is not sufficient to support a reasonable inference of pretext. *See Pennington v. Tex. Dep't of Family & Protective Servs.*, 469 F. App'x 332, 338 (5th Cir. 2012) ("This Court has held . . . that timing alone cannot establish pretext, once an employer has furnished a legitimate, nonretaliatory reason for its actions." (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012); *Roberson v. Alltel Info. Serv.*, 373 F.3d 647, 656 (5th Cir. 2004)).

On the current record, the court has no basis to find that Sanderson Farms's reasons for firing Matson on September 9 or October 11 were "unworthy of credence"; that Sanderson Farms's attempted to reinstate Matson in bad faith; or that there are factual disputes material to deciding these issues. *Caldwell*, 850 F.3d at 242. Because Sanderson Farms has proffered legitimate nondiscriminatory reasons for firing Matson on September 9 and October 11, and Matson has not submitted or identified evidence supporting a reasonable inference that those reasons were a pretext for discrimination or retaliation, the court grants summary judgment on Matson's FMLA, ADA, Title VII, and § 1981 claims.[12]

## IV.    Conclusion

Sanderson Farms's motion for summary judgment is granted. (Docket Entry No. 18). Final judgment is separately entered.

SIGNED on July 23, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

---

[12] The only adverse employment actions alleged in Matson's complaint were the September 9 and October 11 firings, and those actions are the only ones the court must address. (*See* Docket Entry No. 1 at 1–10).